Filed 3/12/14  Radford Ventures v. So. Cal. Gas CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RADFORD VENTURES, LLC, | |
| Plaintiff and Appellant, | G047982 |
| v. | (Super. Ct. No. 30-2011-00508767) |
| SOUTHERN CALIFORNIA GAS COMPANY, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Kirk H. Nakamura, Judge.  Reversed.

Peter D. Collisson Prof. Corp. and Peter D. Collisson for Plaintiff and Appellant.

Law Offices of Rita Gunasekaran and Rita Gunasekaran; Office of the General Counsel Southern California Gas Company, Rachel M. Lamothe and T. Vincent Consolo, for Defendant and Respondent.

# INTRODUCTION

The main issue in this appeal is whether an easement permits the gas company to install a gas meter for one of its customers on another customer's property. The secondary issue is whether the court correctly applied statutes of limitation.

Appellant Radford Ventures, LLC, owns restaurant property in Laguna Beach. Its next-door neighbor is also a restaurant. In 2008, the Southern California Gas Company (the Gas Company) replaced the neighbor's existing gas meter with one that extended partially onto Radford's property. When Radford protested, the Gas Company responded, in effect, that it could put its gas meters wherever it wanted to put them.

A one-day bench trial occurred in October 2012. By that time, the main issue was whether easements granted to the City of Laguna Beach (the City) in the 1920's and 1930's permitted the Gas Company to put the meter where it did. Another issue was whether Radford had waited too long to file suit.

The trial court held that Radford's action for trespass was time-barred, but it had made a timely request for injunctive relief to recover its real property from the Gas Company. On the easement issue, the court ruled for the Gas Company in the absence of legal authority on point. Accordingly, judgment was entered in favor of the Gas Company.[1]

We reverse the judgment. The easements on which the Gas Company relied do not confer upon it permission to put a gas meter benefiting one customer on another customer's property. Judgment on this issue should have been entered for Radford, allowing it to recover its property.

---

[1]     A cross-complaint by the Gas Company against the owners of the Nick's Restaurant property was dismissed as moot.

2

**FACTS**

Radford owns three contiguous lots in Laguna Beach in a tract that fronts on South Coast Highway between Laguna Avenue and Legion Street.[2] The tract, labeled tract 15 on the official map, includes lots numbered 130 through 139. A narrow lot, lot 140, runs behind these lots. Immediately opposite tract 15 lies tract 13, which includes lots 141 through 153.

Title to Radford's lots was first recorded in 1891 in the records of Los Angeles County. The property has changed hands multiple times over the years; Radford bought it in 2006.

Several documents in the chain of title are pertinent to this appeal. At one point in the 1920's, Union Bank owned a large swath of property in that area. In 1925, Union Bank sold lots 130, 131, 132, and the adjoining parts of lot 140, reserving eight-foot "easements for ingress and egress to be used in common by the owners of all or any portion of lots 130 to 138 . . ." of what remained of lot 140.[3] In 1932, an easement "for street purposes" over a six-foot part of lot 130 and of lot 140 was recorded in a deed from Bank of America. Another easement for "the uses and purposes of a public street or alley" was recorded in favor of the City in 1935.

The Gas Company's predecessor owned lot 136 and small parts of lots 146 and 147, which it bought from Union Bank in 1926.[4] In 1936, an easement from the Gas Company's predecessor "for all of the uses and purposes of a public street or alley" was

---

[2] Radford's property consists of lots 130, 131, and 132. The two-story building that occupies the lots houses two restaurants, one on each floor.

[3] The City had already been granted the right to use property at the front of the lots for South Coast Highway.

[4] As the owner of lot 136, the Gas Company's predecessor benefited from the ingress/egress easement in the 1925 Union Bank deed.

3

recorded in favor of the City. This easement was recorded for parts of lots 140 and 141and of lots 146 and 147.[5]

In 1966, the City of Laguna Beach granted to the Gas Company's predecessor a "franchise to lay and use pipes and appurtenances for transmitting and distributing gas for any and all purposes under, along, across, or upon the public streets, ways, alleys and places, as the same now or may hereafter exist . . . ." The Laguna Beach City Council declared Ramona Avenue, the alley that runs behind all the parcels in question, a public street in 1956.

Nick's Restaurant occupies the property (lot 133) next door to the Radford parcels. In 2008, the Gas Company replaced the restaurant's existing gas meter on Ramona Avenue, which was entirely on its property, with a new gas meter and two protective poles.[6] The new meter assemblage extended across the property line onto one of the Radford lots, lot 132. The poles were entirely on Radford's side of the line.

Radford discovered a Gas Company crew putting in the new meter in July 2008, while remodeling was taking place on the Radford parcels. When the Radford construction manager objected, the crew supervisor informed the manager that the Gas Company could put its meters wherever it wanted. Radford protested the encroachment to the City. The City agreed with Radford and informed the Gas Company that it would not sign off on the work until the meter was moved back onto Nick's Restaurant's property and did not stick out into the alley. Despite this representation, however, the property passed its final inspection.

---

[5] The effect of these easements was to allow Ramona Avenue, which was originally a dogleg from South Coast Highway to Legion Street through the middle of tract 15, to become a through street between Laguna Avenue and Legion Street. Previously there was no rear access to a number of lots in both tract 15 and tract 13. The portion of Ramona Avenue that had angled up from South Coast Highway through tract 15 was then abandoned as a street.

[6] The concrete-filled poles were evidently necessary because otherwise trucks navigating the narrow Ramona Avenue alley hit the gas meters.

The City and the Gas Company met to discuss the gas meter problem in May 2011. At that time, the Gas Company was willing to move the meter, but a representative of Nick's Restaurant, who was also present, objected to the expense involved.[7] The meter stayed where it was.

Radford filed suit on September 16, 2011. The complaint stated causes of action for nuisance, negligence, quiet title, and declaratory relief. Radford filed an amended complaint in June 2012, adding a cause of action for slander of title.

In November 2011, the Gas Company informed Radford it would not move the meter, because the City had approved its location.[8] At trial, the Gas Company claimed an easement in favor of the City allowed it to put Nick's Restaurant's gas meter on Radford's property.[9]

After Radford's opening statement, the Gas Company moved for nonsuit on statute of limitations grounds. The court deferred ruling on this motion until the end of trial, at which time it held that Radford's cause of action for trespass was time-barred, but that its request for injunctive relief to recover the property appropriated by the Gas Company was timely. On the easement issue, the court ruled in favor of the Gas Company, citing the lack of legal authority on the issue. Radford has timely appealed.

## DISCUSSION

### I.        Installation of the Gas Meter

"'An easement is a right which subjects land or a tenement to some service for the use of some other land or tenement belonging to another owner, involving primarily the privilege of doing a certain act on, or to the detriment of, the former." [Citation.] [¶] An easement is 'a privilege, without profit, which the owner of one

---

[7]     The record does not reflect the expense referred to.

[8]     The City's city manager denied this and undertook to send the Gas Company a letter to that effect. If he did, the letter is not part of the record.

[9]     The Gas Company alleged an easement by grant deed, through its franchise with the City. It did not allege an easement by necessity, and no evidence was offered at trial to support an easement by necessity.

5

tenement has a right to enjoy in respect of that tenement in or over the tenement of another person, by reason whereof the latter is obliged to suffer or refrain from doing something on his own tenement for the advantage of the former.'" (*Bates v. Terry* (1961) 194 Cal.App.2d 137, 144.)

"The land to which an easement is attached is called the dominant tenement; the land upon which a burden or servitude is laid is called the servient tenement." (Civ. Code, § 803.) "A servitude can be created only by one who has a vested estate in the servient tenement." (Civ. Code, § 804.) The use of the easement cannot burden the servient tenement beyond the scope of the grant. (*Wright v. Best* (1942) 19 Cal.2d 368, 385.)

"Easements are classified as appurtenant or in gross. [Citations.] The basic effect of the distinction between easements appurtenant and easements in gross arises when the owner of an easement conveys his property. The conveyance of the dominant tenement transfers all appurtenant easements to the grantee, even though the easements are not specifically mentioned in the deed. [Citations.] An easement in gross, unlike an appurtenant easement, is merely a personal right to use the land of another. [Citation.] It does not pass with the land." (*Moylan v. Dykes* (1986) 181 Cal.App.3d 561, 568.)

It is undisputed that the City was granted and accepted an easement over lot 140 "for street purposes."[10] It is also undisputed that the Gas Company has a franchise from the City to lay and use "pipes and appurtenances" "under, along across or upon" the streets in Laguna Beach. The City, however, could not grant to the Gas Company greater rights than the City itself possessed. (See *Kerr v. Brede* (1960) 180 Cal.App.2d 149, 152.)

---

[10] "An owner of land bounded by a road or street is presumed to own to the center of the way, but the contrary may be shown." (Civ. Code § 831.) Radford, as the owner of lots 130, 131, and 132, owns the land to the middle of Ramona Avenue, subject to the easement. (See *City of Anaheim v. Metropolitan Water Dist. of Southern Cal.* (1978) 82 Cal.App.3d 763, 769.)

6

The question thus becomes whether an easement "for street purposes" includes the right to install one customer's gas meter on another customer's property. "The extent of a servitude is determined by the nature of the grant, or the nature of the enjoyment by which it was acquired." (Civ. Code, § 806.) The scope of an easement, like the construction of deeds generally, is a question of law. (*Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225, 245.) Although the Gas Company, as a utility, is regulated by the Public Utilities Commission, the superior court has jurisdiction to determine whether a utility has an easement over a particular property. (*Id.* at p. 231.)

As the court pointed out in *Bello v. ABA Energy Corp.* (2004) 121 Cal.App.4th 301, 307-309, there are two lines of authority concerning the uses to which a public right-of-way easement may be put. In *Gurnsey v. Northern California Power Co.* (1911) 160 Cal. 699 (*Gurnsey*), the court found that an easement for a public wagon road or highway running across the plaintiff's land did not allow an electric company to plant its power poles along the road, a franchise from the county board of supervisors notwithstanding. "[T]he easement or right which the public acquires by the establishment of a highway is the right to travel thereover, and . . . the only control over it which the board of supervisors, as trustees for the public, can exercise, is such as is necessary to maintain the highway in a proper and convenient manner for the exercise of the use by the public." (*Id.* at p. 705.) "The board could not confer permission on the company for purposes, not incidental to the proper use of the highway, to invade the

property rights of plaintiff in the soil by digging holes therein and erecting poles." (*Id.* at p. 707.)[11]

By contrast, the court in *Montgomery v. Santa Ana W. R. Co.* (1894) 104 Cal. 186 (*Montgomery*), found that an easement "for street purposes" included the construction and operation of a railway track for freight and passenger cars. "[W]hen a public street in a city is dedicated to the general use of the public, it involves its use subject to municipal control and limitations for all the uses and purposes of the public as a street, including such methods for the transportation of passengers and freight as modern science and improvements may have rendered necessary, and that the application of these methods, and indeed of those yet to be discovered, must have been contemplated when the street was opened and the right of way obtained, whether by dedication, purchase, or condemnation proceedings, and hence that such a user imposes no new burden or servitude upon the owner of the abutting land." (*Id.* at pp. 191-192.) As the court noted, "The world moves," (*ibid.*) and a public right-of-way easement must be broad and flexible enough to allow for improvements in technology, without requiring outlays from the public purse to secure additional rights. (See also *Faus v. Los Angeles* (1967) 67 Cal.2d 350, 355-357 [substitution of modern buses for obsolete electric street cars within grant of street-car easement]; *Anderson v. Time Warner Telecom of California* (2005) 129 Cal.App.4th 411, 416 [installation of fiber optic cables within scope of highway easement].)

---

[11]    An important, though unspoken, factor in the case seems to be the sparsely-populated nature of the area under discussion. The court acknowledged that "[i]t may be that a public highway, by reason of its proximity to a large city, is so heavily traveled that in the judgment of the county authorities it would be necessary, to promote the convenience, and safety of the traveling public, that the highway be lighted. It seems to be well settled by the weight of authority that, under a general power over public highways to promote the safety and convenience of the public travel thereover, the authorities have a right to provide for the lighting of such highway at night. And for that purpose a public service corporation may be granted a franchise to erect its poles thereon; that such a use of the highway for the purpose of lighting it is incidental to the full enjoyment of the public easement imposing no additional servitude of which the abutting owner can complain." (*Gurnsey, supra,* 160 Cal. at p. 706.)

8

A crucial distinction between the expansive view taken in *Montgomery* and the much narrower view taken in *Gurnsey* may be found in the use to which the disputed operations were put. In *Gurnsey* the power poles were delivering power only to one or two customers. (*Gurnsey, supra,* 160 Cal. at pp. 707-708.) In *Montgomery*, the entire City of Santa Ana, and even the entire area, could benefit from the railway's operation in hauling freight and passengers. Thus an easement for a public right-of-way had to be more broadly interpreted in Santa Ana than in Tehema County (at least in 1911), to give maximum flexibility for improvements to benefit the public.

The Gas Company's right to lay gas lines under Ramona Avenue is not disputed; these lines benefit the public at large. The meter installed partially on Radford's property, however, does not benefit the public at large; it benefits Nick's Restaurant and only Nick's Restaurant. "We know of no principle of law or power in a court of equity to justify or authorize an invasion of the property rights of one private party to serve the convenience or necessities of another private party. Such a principle, if once adopted by judicial tribunals, upon grounds of necessity, would, in its practical operation, result in a system of judicial condemnation of the property of one citizen to answer an assumed necessity or convenience of another citizen, and the sacred right of private property, so jealously guarded by courts in all Englishspeaking countries, would become but a shadowy unsubstantiality." (*Felsenthal v. Warring* (1919) 40 Cal.App. 119, 131.)

We therefore conclude that an easement "for street purposes" does not include permission to install a meter benefiting only one Gas Company customer on another customer's property. The grant of an easement cannot be enlarged without the consent of the parties affected. (*Colegrove Water Co. v. Hollywood* (1907) 151 Cal. 425, 429; see also *O'Dea v. County of San Mateo* (1956) 139 Cal.App.2d 659, 661 [easement for subsurface pipe did not confer right to lay pipe above ground].) The meter the Gas

9

Company installed on Radford's property did not benefit the public, and it was installed without Radford's permission. Radford was entitled to recover its property.

## II.        Statutes of Limitation

The limitations period for a cause of action for trespass or injury to real property is three years. (Code Civ. Proc., § 338, subd. (b).) The gas meter was installed on Radford's property in July 2008, but Radford did not file suit until September 2011, over three years later. Because the meter was placed permanently, and was therefore not an intermittent trespass, the statute began to run as soon as it was installed. (See *Carbine v. Meyer* (1954) 126 Cal.App.2d 386, 390.) Accordingly, a cause of action for trespass – interference with a possessory interest in real property (*Smith v. Cap Concrete, Inc.* (1982) 133 Cal.App.3d 769, 774) – is barred.

The situation is different, however, with respect to the injunctive relief Radford has requested. Radford is, in effect, seeking to recover real property appropriated by the Gas Company, and such a cause of action is governed by the five-year statutes of Code of Civil Procedure sections 318 and 321.[12] The Gas Company did not dispute Radford's title to the property in question. Under these statutes, as the court explained in *Harrison v. Welch* (2004) 116 Cal.App.4th 1084, "unless and until the encroacher's use of the property ripens into title by adverse possession or a valid prescriptive easement,[13] the legal title holder's right to bring an action to recover his or her property from the encroacher *never* expires. This must be so, 'otherwise, the record

---

[12]        Code of Civil Procedure section 318 provides: "No action for the recovery of real property, or for the recovery of the possession thereof, can be maintained, unless it appear that the plaintiff, his ancestor, predecessor, or grantor, was seised or possessed of the property in question, within five years before the commencement of the action." Code of Civil Procedure section 321 provides: "In every action for the recovery of real property, or the possession thereof, the person establishing a legal title to the property is presumed to have been possessed thereof within the time required by law, and the occupation of the property by any other person is deemed to have been under and in subordination to the legal title, unless it appear that the property has been held and possessed adversely to such legal title, for five years before the commencement of the action."

[13]        California requires five years of open adverse use to perfect a prescriptive easement, so that was not accomplished here.

10

owner would be unable to recover possession, and a possessor would be unable to establish title' or a prescriptive easement. [Citation.]" (*Id.* at p. 1096.)

We recognize that in *Gurnsey* the Supreme Court restricted the plaintiff landowner to damages and refused to grant his request that the trespassing power company be required to take down its poles. (*Gurnsey, supra*, 160 Cal. at p. 709.) In that case, however, "although the entry was originally without right, the owner permitted the [public service] corporation to make the entry on his land and complete and construct the works for which his land was appropriated, and failed to bring any action until after public interests, by reason of the construction, had intervened." (*Ibid.*) No such circumstances occurred in this case. Radford protested immediately to both the Gas Company and to the City about the encroachment, and, in any event, no public interest has intervened. The meter was and still is of benefit only to Nick's Restaurant. The trial court correctly applied the relevant statutes of limitation.

## DISPOSITION

The judgment is reversed. Appellant is to recover its costs on appeal.

BEDSWORTH, J.

I CONCUR:

RYLAARSDAM, J.

11

O'LEARY, P.J., Dissenting.

I respectfully dissent.

I do not believe this case can be viewed through the prism of private easements. It is undisputed the gas meter and guard posts at issue here lie entirely within a public alley created as a result of easements for street purposes granted to the City by Radford's predecessors in interest.[1] One of the easements states it was for "street purposes;" the other states it was for "all of the uses and purposes of a public street or alley . . . ." The Gas Company installed the meter and guard posts under authority of the franchise granted by the City to lay and use "pipes and appurtenances for transmitting and distributing gas for any and all purposes under, along, across or upon the public streets, ways, alleys and places" (original capitalization omitted) in the City. Accordingly, the case should be analyzed as one concerning the rights of abutting property owners vis à vis a public easement or right of way for public streets.

"A public right-of-way is a form of easement, in that it grants use rights in a particular parcel of land to nonowners of the land. [Citations.] A private easement ordinarily vests those use rights in the owner of a particular parcel of neighboring property, the 'dominant tenement.' [Citation.] Unlike a private easement, the use rights of a public right-of-way are vested equally in each and every member of the public." (*Bello v. ABA Energy Corp.* (2004) 121 Cal.App.4th 301, 308 (*Bello*).)

Our Supreme Court has long observed the limitations on the rights of the owners of property abutting a public street, even when the owner holds fee title to the street. In *Colegrove W. Co. v. City of Hollywood* (1907) 151 Cal. 425, 429 (*Colegrove*), the court observed, "The right of the abutting owner is, of course, always subordinate to

---

[1] For our purposes there is no distinction between a public alley and a public street. (See *People v. Blazina* (1976) 55 Cal.App.3d Supp. 35, 38; Veh. Code, § 110 [alley a highway not exceeding 25 feet in width.)

1

the rights of the public. In city streets the easement of the public is, as a result of the conditions of urban life, more extensive than in roads through sparsely inhabited regions. In cities, it is customary to devote not only the surface of the street and the space above the street to public use, but the municipality may, and frequently does, occupy the soil beneath the surface for the accommodation of sewers, gas and water pipes, electric wires, and conduits for railroads. Where the city undertakes to occupy the space above or below the surface of the street for any purpose within the scope of the public uses to which highways may be put, the use by the owner of the fee must yield to the public use."

In *Montgomery v. Railway Company* (1894) 104 Cal. 186 (*Montgomery*), the court observed, "'[t]he establishment of a public highway practically divests the owner of a fee to the land upon which it is laid out of the entire present beneficial interest of a private nature which he has therein. It leaves him nothing but the possibility of a reinvestment of his former interest in case the highway should be discontinued as such. . . .'" (*Id.* at p. 193, quoting *Paquet v. Mt. Tabor St. R'y Co.* (1889) 18 Or. 233, 235 [22 P. 906, 907]; see also *Bello, supra,* 121 Cal.App.4th at pp. 309, 320.)[2]

As *Bello* observed, the Supreme Court has followed two approaches in assessing the scope of a public right-of-way. (*Bello*, *supra*, 121 Cal.App.4th at p. 307.) The restrictive approach found in *Gurnsey v. Northern California Power Co.* (1911) 160 Cal. 699, applies "only to rights-of-way that have yet to be subjected to the 'other and further uses' that are incident to modern development. [Citation.]" (*Bello*, *supra*, 121 Cal.App.4th at p. 308.) The expansive approach' found in *Montgomery, supra,* 104 Cal. 186, and *Colegrove*, *supra,* 151 Cal. 425, should apply where "as a result of the

_____

2          One commentator has observed the public's interest in controlling the use of its public streets "is so broad that there is little practical difference between a highway easement and public ownership of the land on which the highway is built." (Stokes*, Access Management: Balancing Public and Private Rights in the Modern "Commons" of the Roadway* (2012) 60 Clev. St. L.Rev. 585, 591, fn. omitted.)

2

demands of urbanization, public rights-of-way located in developed areas are subject to a wide range of 'other and further uses' besides surface transportation, including the installation of sewage, water, gas, and communications lines.  [Citation.]"  (*Bello*, *supra*, 121 Cal.App.4th at p. 307.)  This is so even when the public right-of-way is obtained through an express grant expressed in broad summary language as it was here, i.e., for "street purposes," or for "all of the uses and purposes of a public street or alley . . . ."  (*Bello*, *supra*, 121 Cal.App.4th at p. 318 ["Grants using such summary language and rights-of-way for which no specific grant language exists consistently have been treated as subject to a common law establishing generic rights in a public right-of-way.  Only where the right-of-way conveyance is shown to contain specific language beyond the general reference to a road or highway have courts been guided by the specific language of the grant . . ."].)

I believe the expansive approach of *Montgomery* is the correct approach for analyzing the Gas Company's use of Ramona Avenue, which is a public street in a fully urban setting that has already been subjected to a wide range of uses besides mere surface transportation.  As explained in *Bello*, *supra*, 121 Cal.App.4th at pages 310-311, the more modern trend is to apply the *Montgomery* approach.  *Montgomery* held a public easement for street purposes necessarily encompassed the other kinds of uses to which streets are subjected in modern times "such as the construction of sewers and drains, laying of gas and water pipes, erection of telegraph and telephone wires, and a variety of other improvements, beneath, upon, and above the surface . . . ."  (*Montgomery, supra,* 104 Cal. at p. 189; see also *Norris v. State of California ex rel. Dept. Pub. Wks.* (1968) 261 Cal.App.2d 41, 47 ["'When land is taken or dedicated for use as a highway, the taking or dedication should be presumed to be not merely for such purposes and uses as were known and customary, at that time, but also for all public purposes, present or prospective, whether then known or not, consistent with the character of such

3

highways . . ."].)  As the Supreme Court later explained in *Faus v. City of Los Angeles* (1967) 67 Cal.2d 350, 354-355, such public easements should be read to have intended to accommodate future needs and anticipate changed economic and technological conditions.  Accordingly, in *Faus*, a public easement granted expressly for operation of electric interurban railway was broadly interpreted to allow for operation equivalent motorbus service.  (*Ibid.*)  (See also *Hayes v. Handley* (1920) 182 Cal. 273, 282-284 [underground traffic tunnel within scope of easement for public street]; *Anderson v. Time Warner Telecom of California* (2005) 129 Cal.App.4th 411, 415-416 [fiber optic cables within scope of telephone company's statutory easement to use highway to install telephone and telegraph lines]; *Bello, supra,* 121 Cal.App.4th at p. 320 [installation of private gas pipeline within scope of public street easement].)

*Bello* articulates useful criteria for determining whether a proposed use of a public right-of-way is permitted.  The use should "(1) serve as a means, or be incident to a means, for the transport or transmission of people, commodities, waste products or information, or serve public safety [citations]; (2) serve either the public interest or a private interest of the underlying landowner that does not interfere with the public's use rights [citation]; and (3) not unduly endanger or interfere with use of the abutting property.  [Citation.]"  (*Bello, supra,* 121 Cal.App.4th at pp. 315-316.)

Because there was no statement of decision (Code Civ. Proc., § 632), under the doctrine of implied findings, we should infer the trial court made all factual findings necessary to support the judgment that are supported by substantial evidence, and we indulge all intendments and presumptions in favor of the judgment.  (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58-59.)  Applying the *Bello* criteria, I would find the record supports the trial court's conclusion use of the Ramona Avenue public street easement to place an above ground gas meter for Nick's Restaurant is a permissible use of the public right-of-way.

4

The first criteria articulated in *Bello* is clearly met.  The meter plainly serves as a means to deliver a commodity—natural gas.  Public Utilities Code section 451, requires a public utility "shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."  A natural gas usage meter certainly falls within this mandate.  (See e.g., *National Communications Center Corp. v. PT & T Co.* (1979) 2 Cal.P.U.C.2d 533 [1979 WL 50292, 14-15] [telephone company's failure to advise customer of availability of line usage meters violates duty under Public Utilities Code section 451].)

The majority concludes the above ground meter does not serve the *public* interest, the second *Bello* criteria, because it measures only the natural gas being provided to Nick's Restaurant.  Thus, the majority concludes, because the meter benefits only Nick's Restaurant, it was impermissible to locate it within any part of the public street abutting Radford's property.  I disagree.  The Gas Company is obligated to provide gas to Nick's Restaurant (see *Sawyer v. Southern California Gas Co.* (1929) 206 Cal. 366, 372 ["obligation imposed by law upon a gas company as a public utility to serve all who apply to it for gas without discrimination"]), and it must provide the equipment necessary to do so consistent with "the safety, health, comfort, and convenience of its patrons, employees, and the public."  (Pub. Util. Code, § 451.)  It is in the public interest that gas be delivered safely and efficiently to all customers.  The gas meter does not give Nick's Restaurant any service that is different than that provided to other property owners on Ramona Avenue.  All of the gas meters servicing the commercial properties along Ramona Avenue are positioned behind the properties within the existing easement that runs the length of the commercial properties.  When the Gas Company replaced the existing meter servicing Nick's Restaurant, it did so with a new meter consistent with all

5

of the new meters on the alley.  What differentiates the meter at issue is that due to the increased size of the new meters, and the existing meter site behind Nick's Restaurant, is that the new meter slightly straddles the line between Radford's lot and Nick's Restaurant's lot.  All of the other similar meters along the alley are contained within a single property.  But nothing in the record suggests the location chosen for the new meter (i.e., leaving it at the same spot rather than relocating it) was inappropriate.  There was evidence (photographs explained through the testimony of Samuel Goldstein, Radford's manager), demonstrating the competing electric power lines and electrical conduit at the back of Nick's Restaurant building.

I believe the majority's reliance on *Felsenthal v. Warring* (1919) 40 Cal.App. 119 (*Felsenthal*), for the proposition one private party cannot invade the property of another to serve the convenience or necessities of another private party, is misplaced.  *Felsenthal* involved one property owner's right to divert water via a water-ditch easement across another property owner's land.  The court held the owner of the easement had no right to reconstruct the ditch at a different location after the original ditch washed out, and it concluded his only right was to continue to maintain a ditch on his neighbor's land in the same location as the original.  (*Id.* at p. 125.)  Here, we are not presented with a private party exercising it rights because this case does not involve a private easement.  Here we are considering the scope of a public street easement and the extent to which a public utility may utilize that public property to carry out its mandate to provide "adequate, efficient, just, and reasonable service" to its customers.  (Pub. Util. Code, § 451.)  Moreover, *Felsenthal, supra,* 40 Cal.App. 119, prohibited the easement owner from moving the water ditch to a new location.  Here, the Gas Company did not select a new location.  It simply installed a new modern meter in the same location as the previous one.

6

Moreover, to the extent the majority's opinion would refine what constitutes an appropriate "public use" of a public street to require a direct individual benefit to each property encumbered by a public street easement, it could create havoc. For example, equipment for telephone and/or electric service are often located on such public street easements above and below ground. If the grantor of such an easement decided to forego electric service to rely exclusively on solar power, or to forego traditional telephone service to rely solely on a cellular telephone, that grantor's property would no longer derive a direct benefit from such equipment. Under the majority's interpretation of "public use," could the grantor prohibit repair, upgrade or replacement of existing electric cables, above or below ground? Under this new definition of public use could an individual grantor prohibit access under the easement by a utility company for repair services if the individual's service has not been interrupted or otherwise compromised? Any requirement there be a benefit to the abutting property owner is inconsistent with the notion that in the case of a public easement such as this, the use of the individual owner must yield to the public use. (*Colegrove, supra,* 151 Cal. at p.429; *Bello, supra,* 121 Cal.App.4th at p. 310.)

Finally, the third criteria of *Bello*, that the use of the public right of way "not unduly endanger or interfere with use of the abutting property," (*Bello, supra,* 121 Cal.App.4th at pp. 315-316), is also supported by substantial evidence. I agree with the majority's implicit rejection of the Gas Company employee's assertion the Gas Company could put its meters wherever it wanted. That is not an appropriate exercise of the franchise. The majority acknowledges in *Montgomery* the court held a public right-of-way easement must be broad and flexible enough to allow improvements in technology. Here, the installation of new meters throughout the alley was an improvement consistent with *Montgomery.* And the evidence establishes that regardless of the Gas Company's employee's quip, the placement of the new meter in this case was

7

not random or arbitrary.  It was placed in the same location as the previous meter and reasonable in view of the location of other existing utilities' equipment.  The photographic evidence shows the new larger meter serving Nick's Restaurant encroaches minimally onto Radford's property—10-12 inches.  There was evidence the larger meter and guard posts did not interfere with the collection of trash from Radford's building, and although Radford's manager believed the guard posts were unattractive, the photographic evidence shows they are consistent with similar posts in front of other above ground meters along the public street.  To hold the installation of a new replacement meter several inches larger in the same location as the previous meter exceeds the rights granted under the decades old public street easement is not supported by the law.  I would affirm the judgment.


O'LEARY, P. J.


8